**UNITED STATES of America**

v.

**MRS. SMITH'S PIE COMPANY.**

Civ. A. No. 74–419.

United States District Court,
E. D. Pennsylvania.

Nov. 18, 1976.

Walter L. Devany, William A. DeStefano, Norma B. Carter, Antitrust Division, Philadelphia, Pa., for plaintiff.

Ellis G. Arnall, Cleburne E. Gregory, Jr., Allen I. Hirsch, Thomas R. Todd, Jr., Arnall, Golden & Gregory, Atlanta, Ga., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

NEWCOMER, District Judge.

This is an antitrust action brought by the government to challenge the acquisition of various other companies by Mrs. Smith's Pie Company. After considering the evidence, we have concluded that the acquisitions violated Section 7 of the Clayton Act.

FINDINGS OF FACT

1. The defendant, Mrs. Smith's Pie Company, is a Delaware corporation with its principal place of business in Pottstown, Pennsylvania. Mrs. Smith's produces pies, other kinds of desserts, and a few other products. It sells frozen products nationally, and fresh baked products in the Mid-Atlantic region. Mrs. Smith's is the largest producer of frozen dessert pies in the United States.

2. During calendar year 1972, Mrs. Smith's sold frozen dessert pies worth approximately $47,949,000. Of this, approximately $33,829,000 represented sales to groceries for eventual home consumption, and $14,120,000 represented sales to institutional or food service operations for consumption on the premises.

3. The Lloyd J. Harriss Pie Company ("Lloyd Harriss") is a Delaware corporation with its principal place of business in Chicago, Illinois. Lloyd Harriss is a producer of dessert products, including fresh and frozen pies.

4. Michigan Lloyd J. Harriss Company, ("Michigan Harriss") is a Michigan corporation, with its principal place of business also in Michigan. Michigan Harriss is a producer of frozen dessert products, including frozen pies and pie shells.

5. Douglas Cold Storage Company ("Douglas") is a Delaware corporation with its principal place of business in Michigan. At the time of the acquisition, Douglas was engaged in real estate and financial operations and acquisitions of equipment on behalf of both Harriss companies.

6. Food Industries of America ("Food Industries") is a Michigan Corporation with its principal place of business in Michigan. Food Industries processes fruit, primarily for the Harriss companies.

7. On May 11, 1973, Mrs. Smith's Pie Company acquired all the stock of Michigan Harriss, Lloyd Harriss, Douglas, and Food Industries. At that time, the four acquired companies (hereinafter collectively referred to as "Harriss") were under common management, ownership and control. Mrs. Smith's paid $5,268,000 for all the capital stock of Harriss, and thereby obtained administrative offices, production and storage facilities, a fruit processing plant, and the machinery, equipment and inventory contained in these facilities. The acquisition of Harriss enabled Mrs. Smith's to reduce transportation costs of raw materials and frozen dessert pies.

8. At the time of the acquisition, Harriss sold frozen dessert pies throughout the United States. During calendar year 1972, Harriss' sales of frozen dessert pies totaled approximately $11,981,000. Of this, approximately $6,163,000 represented sales to groceries for eventual home consumption, and $5,818,000 represented sales to institutional and food service customers for consumption on the premises.

9. A frozen pie is one that is frozen immediately after it is produced, and is shipped from the pie plant in a frozen state. A fresh pie (or ready-bake pie) is one that usually is baked immediately after it is produced, and is shipped from the pie plant in an unfrozen state. Some commercial marketed dessert pies share characteristics of both fresh and frozen pies. For example, in-store bake pies are frozen pies that are baked by the supermarket and sold to the consumer as fresh-baked pies. Similarly, Mrs. Smith's presently operates Pie Kitchens in which frozen pies are shipped to a local area, where they are baked by Mrs. Smith's and distributed to restaurants and supermarkets as fresh baked pies.

10. The most important equipment for making frozen dessert pies is a pie machine. A pie machine can make any kind of pie, fresh or frozen. A pie machine also can be set up to make other similar dessert products, such as turnovers, tarts, cobblers, danish, and pie shells. However, a pie machine cannot make most other desserts, such as cakes, ice cream or puddings.

11. Companies that make both frozen and fresh pies often have specialized plants which make only fresh or only frozen pies. This is not necessary, however, and some plants make both fresh and frozen pies. The only difference in machinery between a

frozen plant and a fresh plant is that a frozen plant must have freezing equipment and large cold storage facilities, while a fresh plant needs an oven.

12. Although various individual pieces of equipment used in the production of frozen dessert pies can be used in making fresh pies and other desserts, a complete production line for manufacturing frozen dessert pies is not suitable for producing other dessert products.

13. Both fresh pies and frozen pies are manufactured in much the same way. At the end of the manufacturing process, the fresh pie is baked for consumption, and the frozen pie is frozen. Thus, frozen dessert pies are sold in a frozen state and must be baked or thawed before consumption.

14. Frozen pies are essentially non-perishable, while fresh baked pies have a shelf life of two to five days. Because frozen pies can be stored for long periods of time, they are produced to inventory demands, and several months' supply of a particular variety of pie may be made in one production run. Fresh baked pies, on the other hand, must be produced according to daily demand, and relatively small quantities of many varieties of pie must be produced every day. Because the production line does not have to be stopped as frequently to change from one variety of pie to another, frozen dessert pie production is more efficient than production of ready baked pies.

15. Although the ingredients and recipes for frozen dessert pies and fresh baked pies are practically identical, fresh baked pies may have preservatives and a thicker crust to protect the pie during transportation.

16. Because of differences in perishability, frozen pies and fresh pies are distributed in very different ways. Frozen pies are shipped in refrigerated trucks from the producer to frozen food warehouses operated by supermarket chains or distributors. Title to the pies passes to the distributor upon delivery to the warehouse. Frozen pies are sold in large quantities, and can be sold throughout the United States from a single plant. A distributor normally sells frozen pies to supermarkets or food service operations, which in turn sell to ultimate consumers. Frozen pies are displayed in the frozen food cabinet, usually in an area designated for frozen dessert products.

Fresh baked pies usually are distributed by the producer in small unrefrigerated trucks running regular routes. The pies are delivered directly to individual grocery stores or restaurants on a daily basis, and deliveries are usually on consignment. Thus, if a fresh baked pie is unsold at the end of its shelf life, it can be returned to the producer. Because of their short shelf life, fresh baked pies can only be delivered within a radius of 100–150 miles from the pie plant.

17. Fresh baked pies are more expensive to distribute than frozen pies, and they also entail higher labor costs because of the baking process.

18. Because appearance is more important in selling fresh-baked pies, fresh pies are usually sold in windowboxes or unboxed. Frozen pies normally are sold in boxes with pictures of the pie, or to the institutional trade in plain boxes.

19. Because advertising is important in the frozen dessert pie market, advertising and marketing costs are a barrier to entry into the market for potential competitors.

20. Both Mrs. Smith's and Harriss have established separate corporations or divisions for frozen dessert pies and fresh baked pies, probably because of the different methods of production and distribution for each product.

21. A frozen pie is not consumable until it is baked. Once it is baked, a frozen pie is practically identical to a fresh-baked pie. For example, it has the same shelf-life of from two to five days, and a consumer, or even an expert, cannot distinguish between a frozen pie, a commercially fresh-baked pie and a homemade pie.

22. Once a frozen pie is baked, its characteristics and uses are very similar to those of fresh baked pies and other dessert products such as tarts, turnovers, cobblers, danish, cheese cakes or Boston cream pies.

23. The United States Bureau of the Census publishes information on manufacturing which is divided into various classifications. The four-digit code defines industries in terms of groups of related products. The five digit code is narrower, and classifies more-or-less homogenous products. The most specific classification is a seven digit code. Frozen pie is a category in the seven digit code; therefore, the Bureau of the Census provides sales and other information for frozen dessert pies as a separate category from other desserts. Of course, the mere fact that the Census provides separate information for frozen dessert pies does not mean that frozen pies do not compete with fresh-baked pies or with other desserts. Competition is not a criteria for making seven digit classifications.

24. Selling Area Marketing, Inc. ("SAMI") also collects and publishes separate information for sales of frozen dessert pies. SAMI reports the movement of various products at the retail level by analyzing warehouse withdrawals as reported by participating customers. Of course, the mere fact that SAMI reports frozen pie as a separate category does not indicate any absence of competition between frozen pie and other desserts. SAMI supplies separate information for many individual products. Because no representative of SAMI testified during the trial, we have no detailed information concerning how SAMI gathers its information, how it defines its various categories, or what specific items are included in the category of frozen dessert pie. SAMI figures may be distorted by lack of participation of wholesaler or distributors or incomplete reporting by participants. In addition, SAMI does not report direct store deliveries or sales to food service or institutional customers.

Nevertheless, SAMI is a nationally respected authority on sales of products through warehouses, and persons in the industry consider it an accurate reflection of market share data for retail frozen dessert pies. Mrs. Smith's itself subscribes at a substantial cost to SAMI reports for retail frozen dessert pies. It does not subscribe to SAMI for reports on any other dessert product. Mrs. Smith's has demonstrated its belief in the accuracy of SAMI data by including such data in its 1972 Annual Report to stockholders, and by giving such data to its customers or to newspapers and periodicals.

25. Although there are no trade associations exclusively for producers of frozen dessert pies, and most producers of frozen pies also make other dessert items, producers of frozen dessert pies do recognize frozen dessert pies as a separate industry. The testimony indicated that frozen pie manufacturers consider themselves in competition with other producers of frozen dessert pies. In its 1972 Annual Report Mrs. Smith's itself refers to its competitors as other producers of frozen pies, and notes that it dominates the retail market for frozen dessert pies. The Annual Report separates the frozen pie market from the market for other desserts and the market for fresh baked pies. In fact, Mrs. Smith's often divides the frozen pie market into separate components for retail sales and institutional or food service sales.

26. Frozen dessert pie producers compete primarily with each other for space in the frozen food cabinets of supermarkets. For this reason a frozen pie producer making a sales presentation would compare his product in terms of price and quality to other frozen dessert pies, not to fresh pies or other desserts. In deciding what brand of frozen dessert pie to stock, grocery stores compare one brand of frozen dessert pies to other brands of frozen pies, and not to other dessert products. A grocery store will not promote two brands of frozen dessert pie at the same time, but it could promote cakes and pies at the same time.

27. Frozen food products generally are distributed through brokers, but a manufacturer will not use a broker who handles a line of products that conflicts with the manufacturer's particular product. Brokers and producers of frozen dessert pies generally do not consider it a conflict of interest for a broker to represent a producer of frozen dessert pies and a producer of other

dessert products, except possibly for frozen tarts or other fruit filled pastry. It is a conflict of interest for a broker to represent two producers of frozen dessert pies.

28. Despite the fact that consumers and food service operators perceive that frozen dessert pies are one of many dessert products, there is a separate and distinct demand for frozen dessert pies. Supermarkets consider it necessary to stock frozen dessert pies because of customers demand. A significant number of food service operators and food retailers who sell frozen dessert pies believe they could not switch to other dessert products without significantly impairing their operations, if frozen dessert pies became unavailable or too expensive.

29. Frozen dessert pies are sold at a higher price than comparable fresh pies because of higher production and distribution costs. In addition, the average price per serving of frozen dessert pies differs significantly from the price per serving of other dessert products. Between 1973 and 1975, the price of frozen dessert pies increased more rapidly than the price of other frozen desserts.

30. Manufacturers generally establish their price for frozen dessert pies on the basis of cost, although they may consider generally the price of other dessert products in determining that a particular price is reasonable. Some producers also consider the prices of other brands of frozen dessert pies.

31. Many other dessert products are interchangeable in use with frozen dessert pie. In fact, certain frozen dessert products such as Boston cream pie, cheese cake, German chocolate cake, or cobblers are so similar to frozen dessert pies that they cannot easily be classified as pies or non-pies.

32. Because there is a degree of substitutability between frozen dessert pies and other dessert items, there is also a degree of price sensitivity between frozen dessert pies and other dessert products. If the price of frozen dessert pies rises sufficiently some consumers will switch to other dessert products. Another way of stating this fact is that there is cross-elasticity of demand between frozen dessert pies and other dessert products. Thus, to some extent, frozen dessert pies compete with all other desserts. On the other hand, some consumers will continue to buy frozen dessert pies despite even a substantial price rise.

33. Although frozen dessert pies are to some extent interchangeable with other dessert products, frozen dessert pies constitute a separate market for antitrust purposes.

34. Within the frozen dessert pie market, separate submarkets might exist for retail frozen dessert pies and institutional (or food service) dessert pies. These separate markets are defined on the basis of differences in customers, methods of distribution, advertising, packaging, size of the pies, and price. Mrs. Smith's itself recognizes these separate markets in its 1972 Annual Report.

35. Retail dessert pies generally are sold through supermarkets to consumers for home consumption. Retail dessert pies usually are eight inches in diameter. Advertising is very important in selling in the retail market, and advertising is aimed directly at the consumer. Packaging for retail frozen dessert pies is more expensive than for food service pies because the packaging must be able to attract the consumer's attention. Retail frozen dessert pies normally are more expensive than food service dessert pies.

36. Institutional or food service frozen dessert pies are sold to restaurants or other institutions which in turn sell them to customers by the slice for consumption on the premises. Food service pies usually are ten inches in diameter, and they are packaged in plain boxes. Advertising for food service frozen dessert pies is aimed primarily at food service operators, and largely is restricted to trade magazines.

37. Because retail frozen dessert pies and food service frozen dessert pies are sold to different customers, a different expertise is required. For example, retail salesmen must be familiar with a producer's advertising program, while food service salesmen

must be able to provide information on nutrition, cost per portion and instructions for baking. Some frozen dessert pie producers specialize in either retail or institutional sales, and some brokers and distributors sell only to retail customers or only to food service customers. If a broker or distributor sells to both retail and food service customers, it usually· has separate sales forces for each market.

38. Total sales of frozen dessert pies in the United States in 1972 were approximately $169,300,000. Based on defendant's sales in that year of $47,900,000, defendant had approximately 28 percent of the national frozen dessert pie market immediately before the acquisition of Harriss. Harriss' sales of $11,900,000 in 1972 represented approximately seven percent of the same market. After the acquisition, Mrs. Smith's market share was approximately 35 percent.

39. Prior to the acquisition, the top four producers accounted for 53 percent of the frozen dessert pie market, and the top eight producers accounted for 75 percent. The defendant's acquisition of Harriss substantially increased concentration in the frozen dessert pie industry, and eliminated Harriss as an independent competitor.

40. The acquisition also enabled Mrs. Smith's to acquire production and storage facilities in the mid-West, and thereby reduce transportation costs of raw materials and frozen dessert pies.

## DISCUSSION

· This suit involves an alleged violation of Section 7 of the Clayton Act, which provides that:

> "No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock . . . or any part of the assets of another corporation also · engaged in commerce, where in any line of commerce in any section of the country, the effect of. such acquisition may be substantially to lessen competition, or tend to create a monopoly." 15 U.S.C. § 18.

It is undisputed that both Mrs. Smith's and Harriss are corporations engaged in interstate commerce, and that Mrs. Smith's acquired all the stock of Harriss on May 11, 1973. Since it also is relatively clear that both Mrs. Smith's and Harriss are substantial producers of frozen dessert pies, the principal issue in this case is whether frozen dessert pies constitute a relevant product market ("line of commerce") under Section 7 of the Clayton Act.

Before reaching the merits of this issue, we will discuss briefly some of the expert testimony presented by the parties on the relevant market issue. The defendant introduced three studies to support its position that frozen dessert pies cannot be considered a relevant product market. The first study was performed by the Market Research Corporation using data compiled from the National Household Menu Census. This study provided information concerning typical eating patterns and the actual use of various food products. For example, the study showed that the number of dessert servings per household has been declining, that pie makes up 8.5 percent of all dessert servings, and that frozen dessert pies make up 1.8 percent of all dessert servings. The study also indicated that the price per serving of frozen dessert pies increased by 74 percent between 1973 and 1975, a faster rate than the price increases for other frozen baked products. Finally, the Menu Census demonstrated that households that served frozen dessert pie also served a wide variety of other dessert products in the same two week period. Moreover, in weeks when frozen dessert pie was not served, use of other dessert products increased.

Although the Menu Census study does demonstrate that households serve many different products as desserts, it does not explain why this pattern exists. One possible reason is the consumer's desire for variety. Thus, while the study indicates that in one sense frozen dessert pies are interchangeable in use with other dessert products, it does not exclude the possibility that households might be unwilling to substitute other products for frozen dessert pies at every meal. A consumer preference for

frozen dessert pies as one of many desserts may limit the interchangeability of frozen dessert pies with other dessert products.

The second study introduced by the defendant was performed by the A. J. Wood Research Corporation to determine why use of frozen dessert pies was declining. Although the study did reveal that in some households where use of frozen pies declined, use of other dessert products increased, in an even greater number of households use of other dessert products also declined when use of frozen pies declined. Given these results, the Wood study does not support the defendant's contention that other dessert products are used as substitutes for frozen dessert pie. While the study does show that frozen dessert pie users also use other dessert products, it does not substantiate any relationship between frozen dessert pie and other desserts. In fact, the finding that for many households use of frozen dessert pie and other dessert products declined at the same time tends to show that other desserts are not substituted for frozen dessert pie.

The third study presented by the defendant was performed by Professor Daniel McLaughlin. This study was based on interviews with consumers and food service operators. Consumers were given a list of food items and told to divide the list into groups in terms of menu planning and use. Not surprisingly, few consumers perceived frozen dessert pie as a separate category. Instead, frozen dessert pie was grouped with other desserts, other frozen items, other convenience foods, or other commercially prepared goods. The fact that consumers perceived similarities between frozen dessert pies and other products is not very significant in terms of defining a relevant market. Since the consumers who were interviewed were asked to group various food items in some way, they were almost compelled to find similarities among various items. The qualification provided by the interviewer that the consumer could end up with as many groups as there were items would not eliminate the pressure to find similarities among items in order to group them.

Professor McLaughlin's interviewers also asked consumers what items, if any, they would substitute for frozen dessert pie if it was not available. More than 95 percent of those interviewed perceived frozen dessert pie as interchangeable with at least some other dessert item, and more than 90 percent actually would substitute another item for frozen dessert pie when they did not serve frozen pie. Similar questions were asked of a sample of food service operators, with some interesting results. Pie was considered basic to a dessert menu more often than any other dessert product, and 17 percent of the food service operators polled believe that customers would accept no substitute for pie. Twenty-four percent of those food service operators who have handled frozen dessert pies felt that frozen pie was a separate and distinct product category, not interchangeable with other items, and 36 percent felt that if the price of pie was arbitrarily raised, they could not switch to other items without significantly impairing their operations. Similar figures were compiled when frozen food brokers and buyers were interviewed. These figures do show that a majority of food service operators and frozen food brokers and buyers believe that frozen dessert pies are interchangeable with other items. Nevertheless, they also indicate that a significant portion of those interviewed do consider frozen dessert pies to be a separate product category. Consequently, although Professor McLaughlin's study does confirm that there is a substantial amount of interchangeability between frozen dessert pies and other dessert products, it also establishes that this interchangeability is far from perfect.

To rebut the defendant's expert testimony, the government produced professor Robert McGuckin as an expert in economics and econometrics. Professor McGuckin attempted to demonstrate that frozen dessert pies are a relevant product market because the relationship of changes in price to changes in demand shows a relatively low price elasticity. We have found Dr. McGuckin's testimony completely useless, primarily because we have no basis for evaluating

what a particular elasticity coefficient means. He calculated the price elasticity of frozen dessert pies to be .44, and compared this figure with figures obtained from a book for furniture, milk and other products. We have no idea how these other figures were calculated, nor are we sufficiently familiar with these other products to evaluate the significance of the various elasticity coefficients. An additional deficiency in Dr. McGuckin's calculations is his failure to take inflation into account. Removing the effects of inflation from the price increases for frozen dessert pie results in a significantly higher figure for price elasticity.

■ Taken as a whole, the expert testimony leads us to conclude that substitutes for frozen dessert pies exist and are used. Frozen dessert pie is substantially interchangeable with other dessert products, although some food service operators would have difficulty substituting other products, and consumers may have a preference for frozen dessert pie that limits its interchangeability. The government essentially concedes that frozen dessert pie is interchangeable with other dessert products to some degree, since it admits that all desserts together form the outer boundaries of a product market. Nevertheless, the government contends that frozen dessert pies constitute a distinct sub-market within the broader market encompassing all desserts, and that the sub-market is itself a "line of commerce" for the purposes of the Clayton Act. We agree.

In *Brown Shoe Co. v. United States*, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962), the Supreme Court discussed the possibility of using sub-markets:

"The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it. However, within this broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes. The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors. 370 U.S. at 325, 82 S.Ct. at 1523 (footnotes and citation omitted).

In this case, the evidence showed frozen dessert pies do constitute a relevant submarket as defined by the "practical indicia" mentioned in *Brown Shoe*.

Despite the absence of a "frozen dessert pie" trade association and the difficulty of classifying a few dessert products, both the SAMI Reports and Mrs. Smith's itself recognize frozen dessert pies as a separate product market, and producers are concerned with competition within that market. Frozen dessert pies have distinct characteristics which differentiate them from other desserts. As the defendant's own witnesses testified in deposition, "pie is pie." Clearly pie is different from other desserts such as ice cream, cake, or fruit. Frozen dessert pies are further differentiated by the fact that they are sold in a frozen state. This causes the differences in production, distribution, and sales that were described earlier in the findings of facts. Since frozen dessert pies are frozen when purchased by a consumer, the fact that fresh baked pies and frozen pies are practically identical when they are consumed is not really relevant. When a consumer makes a decision to buy a frozen pie, he or she is buying a product that can be stored in a freezer for months, and then served easily. This distinguishes frozen dessert pie from other pie products, such as a ready-baked pie or pies made "from scratch" at home.

The Government's evidence established that the equipment used to produce frozen dessert pies is distinctive. Although a pie machine can make both fresh and frozen pies, production of frozen dessert pies requires freezing equipment and cold storage facilities, while production of fresh-baked pies requires an oven. Other dessert products, except possibly tarts or cobblers, can-

not be made with a pie machine. The government also showed that producers and sellers ordinarily do not consider the prices of other dessert items in setting a sales price for frozen dessert pies. In addition, the defendant's evidence established that frozen dessert pies are sold at different prices than other dessert items, and that prices have increased more rapidly for frozen dessert pies than for other frozen baked goods. This evidence tends to show that the prices of frozen dessert pies are not sensitive to the prices of other dessert products.

The last factor mentioned by the Court in *Brown Shoe* is the existence of specialized vendors. As has been described in the Findings of Fact, frozen dessert pies are distributed through frozen food brokers. While other frozen foods, including desserts, are distributed in much the same way, fresh baked pies are distributed quite differently, because of their perishability. Thus, although vendors do not deal exclusively with frozen dessert pies, a distributor of frozen dessert pie will not distribute most other dessert products.

An additional "practical indicia" not mentioned by the Supreme Court but which probably should be considered is the presence of entry barriers. Especially in the selling of retail frozen dessert pies, name brand and consumer recognition are important, and take time to develop. Since advertising is important, a new entrant must be prepared to launch an advertising campaign to capture a share of the market. The existence of entry barriers in the frozen dessert pie business is demonstrated by the unsuccessful attempt of Fairfield Farms Kitchen (Marriott Corporation) to enter the frozen dessert pie market.

Our analysis of the various practical indicia enumerated in *Brown Shoe* convinces us that the frozen dessert pie market is sufficiently well-defined to be considered a "line of commerce" for antitrust purposes. Under *Brown Shoe,* this conclusion is not precluded by the fact that frozen dessert pies are interchangeable to some degree with other dessert products. Equally narrow product markets have been approved in many other cases. *See, e.g., United States v. Aluminum Co. of America,* 377 U.S. 271, 84 S.Ct. 1283, 12 L.Ed.2d 314 (1964) (aluminum conductor cable); *United States v. E. I. Du Pont de Nemours & Co.,* 353 U.S. 586, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957) (automotive finishes and fabrics); *General Foods Corp. v. Federal Trade Commission,* 386 F.2d 936 (3d Cir. 1967), *cert. denied,* 391 U.S. 919, 88 S.Ct. 1805, 20 L.Ed.2d 657 (1968) (household steel wool products); *Reynolds Metal Company v. Federal Trade Commission,* 114 U.S.App.D.C. 2, 309 F.2d 223 (1962) (florist foil); *United States· v. Pennzoil Co.,* 252 F.Supp. 962 (W.D.Pa.1965) (Penn Grade crude oil); *United States v. Lever Brothers,* 216 F.Supp. 887 (S.D.N.Y. 1963) (low-sudsing heavy duty detergents).

The defendant has cited numerous cases to support its contention that other dessert products must be included with frozen dessert pies in any relevant product market. Most of these cases can be distinguished. In many of the defendant's cases, the court adopted a broader product at the request of the government. *See, e.g., United States v. Grinnell Corporation,* 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); *United States v. Continental Can Co.,* 378 U.S. 441, 84 S.Ct. 1738, 12 L.Ed.2d 953 (1964); *American Crystal Sugar Co. v. Cuban-American Sugar Co.,* 259 F.2d 524 (2d Cir. 1958); *United States v. Koppers Co., Inc.,* 202 F.Supp. 437 (W.D.Pa.), *app. dismissed,* 371 U.S. 856, 83 S.Ct. 96, 9 L.Ed.2d 95 (1962). Since the Clayton Act is concerned with *any* line· of commerce, the government need not base its case on the narrowest possible market. Thus, when the government is attempting to prevent a merger between two companies, the courts frequently have rejected the argument that each company's product is in a separate market. However, nothing in these cases precludes use of a narrower product market if that is the "line of commerce" where competition is affected.

Several other cases relied on by the defendant involved proposed product markets that were defined in terms of the

defendant's own products. See *Telex Corp. v. International Business Machines Corp.*, 510 F.2d 894 (10th Cir. 1975), *cert. denied*, 423 U.S. 802, 96 S.Ct. 8, 46 L.Ed.2d 244 (1976); *Mogul v. General Motors Corp.*, 391 F.Supp. 1305 (E.D.Pa.1975). Since a product market should not be tailored to fit a defendant's business, defining the market in terms of the defendant's product obviously is improper. In the instant case, however, the market is defined simply as frozen dessert pies without reference to Mrs. Smith's products.

Finally, some of the cases relied on by Mrs. Smith's were decided under the Sherman Act rather than the Clayton Act. The Clayton Act was intended to retard economic concentration in its incipiency by preventing mergers which tend to create a monopoly or which otherwise might lessen competition substantially. See *Brown Shoe Co. v. United States, supra*, 370 U.S. at 317–23, 82 S.Ct. 1502. Since, the Clayton Act deals with probabilities, a defendant may violate the act even though it does not have monopoly power and even though the defendant's product still faces substantial competition. Consequently, Sherman Act cases should not be controlling in defining a "line of commerce" under the Clayton Act. See *Crown Zellerback Corp. v. Federal Trade Commission*, 296 F.2d 800 (9th Cir. 1961), *cert. denied*, 370 U.S. 937, 82 S.Ct. 1581, 8 L.Ed.2d 807 (1962). We believe that this distinction between the Sherman and Clayton Acts is still viable despite the Supreme Court's statement in *United States v. Grinnell Corp., supra*, that "[w]e see no reason to differentiate between 'line' of commerce in the context of the Clayton Act and 'part' of commerce for purposes of the Sherman Act." 384 U.S. at 573, 86 S.Ct. at 1705. There is no indication that the Court intended to state a general rule for all situations. Rather, the Court was noting that in the particular circumstances before it, a Clayton Act case was an appropriate precedent, even though the Court was deciding a Sherman Act question. Although Sherman Act cases certainly are relevant and are entitled to some weight in defining a "line of commerce" under the Clayton Act, we believe that cases decided under the Clayton Act, are stronger precedents, since the tests may differ somewhat under each act.

Whether or not Sherman Act cases are considered, our decision to define the relevant product market as frozen dessert pies is amply supported by the cases cited previously. Industry recognition, unique characteristics and production facilities, distinct prices, specialized vendors, and entry barriers all help define this market. Most importantly, consumer preference for pie and specifically for frozen dessert pie vitiates Mrs. Smith's defense based on substitutability. Consumers may not want pie all the time, but when they do, they should have the benefit of competition in the frozen dessert pie industry. Defendant's proposed product market of all desserts would have the practical effect of exempting dessert producers from important parts of the antitrust laws, a result which would be unwarranted. We hold that the relevant "line of commerce" in this case is frozen dessert pies.

The remaining issues can be resolved much more easily. In addition to determining the appropriate line of commerce in which to analyze the effects of the merger, we also must find an appropriate section of the country for the same purpose. In this case, the entire United States is a proper geographic market. Producers of frozen dessert pies compete for customers throughout the United States, and both Harriss and Mrs. Smith's sell their pies nationally. Thus, the area of competition is the United States as a whole, and the entire country is a proper geographic market. See *United States v. Pabst Brewing Co.*, 384 U.S. 546, 86 S.Ct. 1665, 16 L.Ed.2d 765 (1966).[1]

1. The plaintiff has argued that the frozen dessert pie market can be divided further into markets for institutional pies and for retail pies, and that various metropolitan areas are appropriate sections of the country under Section 7 of the Clayton Act. We need not consider these contentions, since we have concluded that the merger between Mrs. Smith's and Harriss might substantially lessen competition in the entire frozen dessert pie market throughout the United States.

After defining the relevant product market and geographic area, we must analyze the effect of the acquisition on competition in that market. In *Brown Shoe*, the Supreme Court commented:

"The market share which companies may control by merging is one of the most important factors to be considered when determining the probable effects of the combination on effective competition in the relevant market." 370 U.S. at 343, 82 S.Ct. at 1534.

Market share has been employed as the primary measure of a merger's effect on competition in numerous cases, and violations of Section 7 frequently have been predicated on combined market shares much smaller than in this case. *See, e.g., United States v. Pabst Brewing Co.*, 384 U.S. 546, 86 S.Ct. 1665, 16 L.Ed.2d 765 (1966) (combined national market share of 4.5 percent); *United States v. Von's Grocery Co.*, 384 U.S. 270, 86 S.Ct. 1478, 16 L.Ed.2d 555 (1966) (combined market share of 7.5 percent). *In United States v. Philadelphia National Bank*, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963), the Court reiterated the importance of market share in a Section 7 case:

"Specifically, we think that a merger which produces a firm controlling an undue share of the relevant market, and results in a significant increase in the concentration of firms in the market, is so inherently likely to lessen competition substantially that it must be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects." 374 U.S. at 363, 83 S.Ct. at 1741.

The Court then ruled that a merger which resulted in one bank controlling 30 percent of the relevant market violated Section 7.

In the instant case, the market share figures are prima facie evidence that Mrs. Smith's acquisition of Harriss was unlawful. Mrs. Smith's was the leading producer of frozen dessert pies, and Harriss was a substantial competitor before the acquisition. Although the Government's market share data may be subject to some distortions based on possible inaccuracies in the SAMI reports, this data is sufficiently reliable to show a violation in this case. Mrs. Smith's has admitted to a 26 to 28 percent share of the frozen dessert pie market, and Harriss controlled approximately seven percent of that market. The combined share of nearly 35 percent is so substantial that anticompetitive effects must be presumed. Moreover, the defendant has produced no evidence to rebut the Government's prima facie case. Consequently, we hold that Mrs. Smith's acquisition of Harriss violated Section 7 of the Clayton Act.

## CONCLUSIONS OF LAW

1. This court has jurisdiction of this action pursuant to Section 15 of the Clayton Act. (15 U.S.C. § 25).

2. The production of frozen dessert pies within the United States as a whole is an appropriate line of commerce and section of the country in which to measure the effects of Mrs. Smith's acquisition of Harriss, under Section 7 of the Clayton Act. (15 U.S.C. § 18).

3. The acquisition of Harriss by Mrs. Smith's is prohibited by Section 7 of the Clayton Act because the acquisition may substantially lessen competition or tend to create a monopoly in the production of frozen dessert pies throughout the United States.

## CONCLUSION

We have determined that the acquisition of Michigan Lloyd J. Harriss Pie Co., Lloyd J. Harriss Pie Co., Douglas Cold Storage Co., and Food Industries of America, Inc. by Mrs. Smith's Pie Company was a violation of Section 7 of the Clayton Act. Consequently, we intend to enter an order requiring Mrs. Smith's to divest the acquired companies under such terms and conditions as

will promptly restore it as a viable competitive entity, and providing any other appropriate relief. However, rather than entering a judgment order at this time, we will ask the parties to submit a joint proposed final order within thirty (30) days of the date of this memorandum.