**ANSELL INCORPORATED, Plaintiff,**

v.

**SCHMID LABORATORIES, INC. and Allercare/NSL, Inc., Defendants.**

Civ. No. 90–3581 (GEB).

United States District Court,
D. New Jersey.

Feb. 27, 1991.

**468**

Gardner, Carton & Douglas, Chicago, Ill. by Robert J. Wilczek, Walder, Sondak, Berkeley & Brogan, P.A., Roseland, N.J. by Thomas J. Spies, and Pepper, Hamilton & Scheetz, Washington, D.C. by Hugh Latimer, Bruce R. Stewart, and Richard B. Nash, Jr., for plaintiff Ansell Inc.

Wolff & Samson, Roseland, N.J. by Daniel D. Caldwell, for defendant Allercare/NSL, Inc.

Hannoch Weisman, Roseland, N.J. by Brad R. Roth and Menaker & Herrmann, New York City by Richard G. Menaker, for defendant Schmid Laboratories, Inc.

## OPINION

GARRETT E. BROWN, Jr., District Judge.

### I. INTRODUCTION

This is an antitrust action brought by Ansell Incorporated pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, to challenge the acquisition of Allercare/NSL, Inc. by Schmid Laboratories, Inc., as violative of Section 7 of the Clayton Act, 15 U.S.C. § 18. The amended complaint seeks an order of divestiture and or rescission, and such other relief as may be just and proper. Plaintiff asserts no claim for money damages. This Opinion constitutes my Findings of Fact and Conclusions of Law.

### II. FACTUAL AND PROCEDURAL BACKGROUND

#### A. *The Parties*

Plaintiff Ansell Incorporated ("Ansell"), a Delaware corporation with its principal place of business in Eatontown, New Jersey, is a wholly-owned subsidiary of Pacific Dunlop Holdings, Inc., a Delaware corporation wholly owned by Pacific Dunlop Limited, a Victoria (Australia) corporation with its principal place of business in Melbourne, Australia. Ansell is engaged in the business of manufacturing and selling latex rubber condoms, among other consumer products, and describes itself as the largest international producer of such latex consumer products as condoms and gloves. Ansell currently produces in excess of 7.5 million gross in condoms annually out of its condom manufacturing facilities in Troy, Alabama and Dothan, Alabama.

Defendant Schmid Laboratories, Inc. ("Schmid"), currently a division of London International U.S. Holdings, Inc. ("LIUS") is in the business of manufacturing and selling latex condoms and other lines of health care consumer products. LIUS is a wholly-owned subsidiary of London International Group, a United Kingdom corporation. Schmid currently produces approximately 800,000 gross in condoms annually out of its condom manufacturing plant in Anderson, South Carolina.

Defendant Allercare/NSL, Inc. ("Allercare/NSL" or "NSL") is a packager and distributor of health and beauty consumer products with its principal place of business in Lincolnwood, Illinois. Allercare/NSL is a wholly-owned subsidiary of Allercare, Inc., a Minnesota Corporation with its principal place of business in Minneapolis, Minnesota. Prior to September 21, 1990, Allercare/NSL was engaged in the business of selling latex condoms.

### B. The Schmid–Allercare/NSL Transaction

On August 28, 1990, Allercare/NSL entered into an asset purchase agreement to sell its Protex condom business to Schmid for a purchase price of $4,000,000 subject to adjustments. Schmid purchased all of the assets of NSL relating to NSL's packaging and distribution of latex condoms including inventory and manufacturing equipment together with trademarks, trade names, and customer lists. The Schmid–Allercare/NSL transaction closed on September 21, 1990, with the purchase price from the sale placed in escrow pending the resolution of this action.

### C. Procedural Background

Ansell's complaint was filed on September 13, 1990, along with an application for an Order to Show Cause, Temporary Restraining Order and Preliminary Injunction. Ansell subsequently withdrew its request for the emergent relief, without prejudice, and the Court entered a Scheduling Order providing for an accelerated discovery schedule and trial. The matter was set down for non-jury trial on Ansell's application for a permanent injunction. Thereafter, defendants filed a motion for summary judgment which was denied on November 13, 1990. On that same date, the hearing on plaintiff's application for a permanent injunction began. The hearing continued on November 15, November 19 and December 3, 1990.[1]

### D. The Condom Industry

A latex condom is a sheath worn over the male sexual organ to prevent conception or venereal infection during sexual activity. The latex condom manufacturing process consists of pouring liquified latex compound into vats into which are dipped glass formers in various shapes. The formers are dipped continuously into the vats while being moved along a manufacturing line. The resulting film of latex on the formers is removed under carefully monitored conditions. When drying is completed, the sheaths are removed from the dipping machine. After finishing and electronic testing, the sheaths are ready for final processing, which may consist of filming and packaging or of treatment with a lubricant, spermicide, or fragrance, followed by filming and packaging. Condom manufacturers (sometimes known as "dippers") sell to retailers and other customers and in bulk

---

1. This matter was originally assigned to the Honorable Alfred J. Lechner, Jr., United States District Judge for the District of New Jersey. Judge Lechner handled all preliminary motions and began the hearing on plaintiff's application for a permanent injunction on November 13, 1990. Judge Lechner also held proceedings on November 15 and November 19, 1990. On November 19, 1990, the Honorable John F. Gerry, Chief Judge of the District of New Jersey reassigned this action from Judge Lechner to me. The case had proceeded on the basis of sworn statements which constituted the direct testimony of the parties and with live cross examination of certain witnesses. The hearing continued before me on December 3, 1990. Counsel for the defendants wished to recall plaintiff's expert witness Dr. David D. Smith for further cross examination. That being done, all parties agreed they had no objections to my proceeding to complete the trial and determining the credibility of the witnesses as to all issues before the Court.

to firms that package and market under their own brand names (known as "packagers") as well as to other dippers in the United States and overseas. Plaintiff Ansell is the largest dipper in the United States, currently producing over 7.5 million gross of various styles of latex condoms per year at its two plants in Alabama. Carter–Wallace, Inc. ("Carter–Wallace"), is apparently the next largest dipper in the United States with annual production estimated at approximately 2,000,000 gross. Schmid has annual production of approximately 800,000 gross. There are at least three other dippers operating in the United States; Safetex, Aladan and Killian, with combined annual production of over 1,000,000 gross. Prior to the acquisition, NSL was a packager of condoms. Unlike Ansell, Carter–Wallace and Schmid, it had no manufacturing or "dipping" operations. Instead, NSL purchased condom sheaths in bulk from one or more manufacturers, tested and packaged the condoms, and sold them at wholesale primarily to retail merchandisers and vending machine operators.

Sales of condoms in the United States grew during the 1980's, at first at a stable rate, then with a sudden surge due to the AIDS crisis. From total sales in that year of approximately $50 million to retailers, vending machine operators and institutions, condom sales grew steadily to $81 million in 1988. Since then, growth has leveled off.

The dippers and packagers distribute the condoms through various channels of distribution depending upon the particular characteristics and prices of the products. There are several markets in the United States in which latex condoms are sold. The largest of these U.S. markets is the retail market which consists of sales to retail drug stores, food stores and mass merchandizing outlets.[2] The sale of condoms in this market consists primarily of products with well-recognized brand names and specialized packaging.[3] Sales in the

retail market account for about 90% of all latex condom revenues in the United States. Of total estimated 1990 calendar year condom sales of $72,370,000 in this market, retail drug stores account for approximately 70%, food stores approximately 18%, and mass merchandisers approximately 12% of the total. There are two other smaller channels through which condoms are distributed: (1) vending machines, adult stores and mail order catalogues (1990 dollar sales of approximately $3.5 million); and (2) institutional sales, including sales to states, municipalities, clinics and prisons (1990 dollar sales of approximately $5 million).

Ansell also produces, pursuant to receipt of an annual General Services Administration ("GSA") contract awarded on a bid basis, in excess of five million gross of latex condoms. These condoms are distributed free by the United States Agency for International Development ("USAID") outside the United States in third-world countries.

## III. THE RELEVANT MARKETS

### A. *Defining the Relevant Product Market*

■ Product market definition is a significant and much disputed issue in this case. Plaintiff claims that the sale of latex condoms through retail outlets in the United States is the relevant product market or submarket. On the other hand, defendants have a much broader view of the relevant product market, claiming that the proper definition of the market is condoms sold at wholesale within the United States including Ansell's substantial sales to USAID under the GSA contract.

■ "To define the bounds of the product market it is necessary to determine what products are reasonably interchangeable with the product in question, that is to say, products to which consumers would

---

**2.** Also known by industry sources as the "three-outlet channel of distribution".

**3.** The five top condom brands sold in this market, *see infra,* include Carter–Wallace's Trojans,

Schmid's Ramses and Shiek, Ansell's Lifestyles and Allercare/NSL's Protex brand whose acquisition by Schmid is the subject of this dispute.

switch if there were a small but significant non-transitory price increase." *United States v. Calmar*, 612 F.Supp. 1298, 1301 (D.N.J.1985) (citing *Brown Shoe Co. v. United States*, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962); *SmithKline Corp. v. Eli Lilly and Co.*, 575 F.2d 1056 (3d Cir.), *cert. denied*, 439 U.S. 838, 99 S.Ct. 123, 58 L.Ed.2d 134 (1978)). The relevant product market will necessarily be "composed of products that have reasonable interchangeability for the purpose for which they are produced—price, use and qualities considered." *SmithKline Corp.*, 575 F.2d at 1062–63 (quoting *United States v. E.I. du-Pont de Nemours & Co.*, 351 U.S. 377, 404, 76 S.Ct. 994, 1012, 100 L.Ed. 1264 (1956)). The Supreme Court in *Brown Shoe* additionally recognized the possibility of considering relevant product submarkets:

> The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it. However, within this broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes. The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.

*Brown Shoe*, 370 U.S. at 325, 82 S.Ct. at 1524 (footnotes and citation omitted). A well-defined submarket may exist even though all these indicia are not present. *General Food Corp. v. FTC*, 386 F.2d 936, 941 (3d Cir.1967), *cert. denied*, 391 U.S. 919, 88 S.Ct. 1805, 20 L.Ed.2d 657 (1968).

In this case, the Court is convinced that the sale of branded latex condoms to retail distributors does constitute an "economically significant submarket" as defined by the "practical indicia" developed in *Brown Shoe* and its progeny. The analysis which follows will review the parties' claims as to the relevant product market as well as analyze the evidence presented to the

Court with reference to the *Brown Shoe* criteria. The Court will also briefly review the application of the Department of Justice's 1984 Merger Guidelines on defining the relevant product market.

    1. The Parties' Claims.

As noted earlier, plaintiff views the sale of latex condoms "at retail" as the relevant product market to be used by the Court in determining whether the acquisition at issue will substantially lessen competition. Plaintiff stresses that the importance of brand loyalty in this particular market separates it from other sales of condoms, like Ansell's bulk sales to USAID. Edward W. Fernas, Vice President of Ansell's Consumer Products Division noted in his testimony:

> The key to successful sales of latex condoms in the retail market is a well-known and recognized brand name such as Trojan, Ramses or Shiek. In addition to the three dominant brands, the only other brands that have been able to develop customer recognition and loyalty have been Lifestyles, marketed by Ansell, and Protex, marketed by NSL. Their relatively limited success has been the result of extensive marketing efforts over time. No other company has succeeded in entering the market to any significant extent. Trojan, Ramses and Shiek have been well known brand names for decades, and Lifestyles and Protex both have been marketed for at least ten years.

Schmid has also recognized the importance of a recognized brand name in the retail market. It is apparent that this factor was a significant consideration in Schmid's decision to acquire the Protex brand from NSL rather than launching a new brand of its own.

Defendants dispute plaintiff's characterization of the market and claim that the market consists of all wholesale sales of condoms within the United States. They claim that since none of the major condom producers or packagers sell directly to final consumers, but rather sell their output to a group of purchasers, including, large retail stores, other retail outlets, wholesale jobbers, health care vendors, state institu-

tions, vending machine operators, mail order houses and the United States Government (principally USAID), who eventually distribute the condoms, all of these sales comprise one product market.

The Court has also reviewed the ample expert testimony presented by the parties on the issue of product market definition. Plaintiff's expert, Dr. David Smith submitted testimony stating that to include Ansell's USAID sales in the United States retail market is equivalent to measuring Ansell's market share in terms of its total production capacity. This he claims is inappropriate for branded products like the condoms sold through retail outlets. Plaintiff's expert relies upon the practical indicia announced in *Brown Shoe* as well as the analysis employed by the Department of Justice.

Defendant's expert, Dr. M. Bruce Johnson, does not dispute the relevant considerations in defining a product market, however, he arrives at a market definition that includes Ansell's USAID sales. He states that there is a great deal of demand-side substitutability across the products of the different manufacturers. He asserts that the buyers of condoms can and do consider shifting their purchases among the different manufacturer's brands in response to relative prices or other competitive variables. As for the applicability of supply-side substitutability in market definition, Dr. Johnson states that the critical element of supply-side substitutability is the interchangeability of production facilities. He submits that Ansell has the capability of altering its production facilities in order to shift from the production of condoms for sale to USAID to condoms that compete with Schmid's condoms.

2. Applying the *Brown Shoe* Criteria.

Defendants claim that condoms sold at wholesale within the United States constitutes a relevant product market. Treating this assertion as accurate, however, would not foreclose the possibility that the sale of latex condoms through retail outlets constitutes an "economically significant submarket" within the broader market encompassing all wholesale sales, and that this

submarket is itself a "line of commerce" for the purposes of the Clayton Act. *See United States v. Mrs. Smith's Pie Co.*, 440 F.Supp. 220, 228 (E.D.Pa.1976). *Brown Shoe* recognized this possibility when it enumerated a set of "practical indicia" to determine the existence of an "economically significant submarket."

a) *Industry or public recognition of the submarket as a separate economic entity.*

Although dippers may sell their products through a number of different channels of distribution, the evidence presented to the Court clearly shows that the industry participants view their sales to the retail trade as a separate economic entity. Ansell has submitted ample documentation in the form of marketing plans and income and expense analyses that treat their sales to U.S. retailers as a separate market. The reference to this market segment is not limited to plaintiff. Schmid's 1988/89–1991/92 Business Plan makes several references to the U.S. retail condom market noting the fact that "[t]he U.S. retail condom market has shifted from pre-AIDS drug store dominance to an emerging 3–outlet configuration with food stores and mass merchandisers enjoying a sustaining growth trend—that is likely to continue." In addition, the Nielsen Company, an independent marketing research firm that surveys and publishes sales statistics and market share data for the condom industry, maintains its data separately for sales of latex condoms to U.S. retail outlets. Defendants argue that Nielsen only surveys market statistics in the channels of distribution requested by its corporate clients such as Schmid. This, however, would only support the proposition that the industry participants view this as an economically distinct market segment.

b) *The product's peculiar characteristics and uses.*

The parties do not dispute the fact that whether latex condoms are sold at retail or distributed by USAID the product's eventual end use is the same. The parties do, however, disagree on whether the products have peculiar characteristics. Plaintiff's

evidence showed that condoms sold through the retail trade must have recognized brand names, *e.g.*, Trojan, Ramses, Shiek, Lifestyles, and must be sold in attractive, individual boxes with three or twelve individually wrapped condoms per box. The condoms that plaintiff sells to USAID, however, are packaged in strip form in plain white boxes, 100 condoms to a box. It also appears that the condoms sold to USAID are different in shape and/or size from those sold to the retail trade. Defendants claim that plaintiff has the ability to alter its production facilities in order to produce latex condoms for either USAID or its domestic customers and therefore the products do not have peculiar characteristics. The Court finds that the different shapes and sizes, and more importantly, the packaging differences do distinguish the two products.

Several of the product market definition issues presented in this case are similar to those that were presented in *United States v. Mrs. Smith's Pie Co.*, 440 F.Supp. 220 (E.D.Pa.1976). In that case the court noted that within the frozen dessert pie market, separate submarkets might exist for retail frozen dessert pies and institutional (or food service) dessert pies. The court found that these separate markets were defined on the basis of differences in customers, methods of distribution, advertising, packaging, size of the pies and price. *Id.* at 225. Significant peculiar characteristics of the two markets included the fact that retail dessert pies were usually eight inches in diameter whereas institutional or food service pies were usually ten inches in diameter. Additionally, as in this case, the packaging for one product, there retail frozen dessert pies, was more expensive since the packaging must be able to attract the consumer's attention, whereas food service pies were packaged in plain boxes. *Id.*

#### c) *Unique production facilities.*

Plaintiff claims that the production facilities that produce condoms for the retail market are different from those facilities used to produce condoms for USAID. The Court is convinced from the evidence presented that the dipping equipment is substantially the same, with the only difference being the different sizes and shapes of the glass formers used for dipping and the metal mandrels used for electronic testing. Plaintiff maintains, and defendants' expert agrees, that the only significant difference in the production of condoms intended for sale to retailers as opposed to those for sale to USAID appears to be the necessary packaging equipment. The Court believes that the requirement of additional packaging equipment is sufficient to differentiate the production facilities. *Accord Mrs. Smith's Pie Co.*, 440 F.Supp. at 228 (noting that "[a]lthough a pie machine can make both fresh and frozen pies, production of frozen dessert pies requires freezing equipment and cold storage facilities, while production of fresh-baked pies requires an oven").

#### d) *Distinct customers.*

Plaintiff maintains that sales of condoms to retail distributors and to USAID are made to distinct customers arguing that in the "U.S. retail market" condoms are sold to the various retail distributors (drugstores, foodstores and mass merchandisers) for ultimate sale to individual consumers, whereas condoms sold to USAID are distributed outside the United States in developing countries. Defendants contest plaintiff's characterization of customers, claiming that none of the parties in this litigation sells directly to consumers, but rather all sell at the wholesale level to various customers who resell or otherwise distribute to consumers in various ways. Defendants apparently argue that retail distributors and GSA are not distinct customers in this market. The Court cannot agree. As noted earlier, the key to successful sales of latex condoms in the retail market is a well-known and recognized brand name. When a retail distributor makes a decision to buy condoms from a dipper or packager he or she is buying a product with hopes that it will ultimately sell to consumers. Witnesses for both plaintiff and defendants have testified that a retailers' decision to carry a product depends upon the product's proven or reasonably anticipated product turnover. Sales to the retail trade also require an arsenal of marketing tools in-

cluding advertising, rebates and promotional allowances. Sales of latex condoms to USAID, on the other hand, are made pursuant to the receipt of an annual GSA contract awarded on a competitive bidding basis. Mr. Fernas testified that the selling and marketing expenses for the GSA sales are far less than the selling and marketing expenses involved in selling to U.S. retailers. The annual contract is apparently awarded to the manufacturer submitting the lowest bid.

### e) *Distinct prices.*

The prices of latex condoms sold to retail distributors range from $20 to $30 per gross, while the prices to USAID are in the $6 per gross range. This price discrepancy is sufficient to support a finding of distinct prices.

### f) *Sensitivity to price changes.*

The factors that affect the prices of condoms sold to retail distributors are not the same as the factors that affect the winning bids on the sale of condoms to USAID. The evidence presented to the Court shows that the prices of latex condoms sold to USAID are not sensitive to the prices of latex condoms sold to the retail trade. Plaintiff submits that there is no correlation between the prices of the winning bids to USAID as compared with Lifestyles or between inflation adjusted, or real, USAID prices and the U.S. prices of Lifestyles. Defendants contest plaintiff's analysis arguing that even plaintiff's expert conceded that his price correlation analysis failed to meet any statistical standards. Despite the lack of statistical significance, the Court finds that the evidence presented on the issue of price correlation between sales of condoms to the retail trade and sales to USAID is persuasive. It belies common sense to believe that prices set by a process of competitive bidding and prices determined by market considerations would be sensitive to the same market forces.

### g) *Specialized Vendors.*

The last factor mentioned by the Supreme Court in *Brown Shoe* is the existence of specialized vendors. There does not appear to be a need for specialized vendors in the latex condom industry.

Manufacturers and/or packagers can and will sell to the various channels of distribution. In this case, Ansell is a vendor who sells both to U.S. retailers and to USAID, and the other manufacturers have put in bids for the USAID business in the past. The fact that each company may have a distinct sales force for each channel of distribution is non-dispositive.

### h) *Barriers to Entry.*

Although not a factor mentioned by the Supreme Court in *Brown Shoe*, at least one court has cited the presence of entry barriers as an additional factor to consider when defining an economically significant submarket. *See Mrs. Smith's Pie Co.*, 440 F.Supp. at 229. The Court finds that there has been no significant entry into the retail market for latex condoms for the past several years. Plaintiff cites the critical role that brand names play in this market and the difficulty in developing successful brand name recognition and loyalty.

Plaintiff submits that the primary barrier to entry in the U.S. retail market has resulted from the difficulty in developing successful brand name recognition and loyalty to compete with the long-recognized and dominant brands. Plaintiff asserts that Ansell and NSL were able to increase their market shares during an expanding market by finding new niche markets which opened up as sales increased and which were ignored by the established market leaders. Plaintiff argues that any similar increase in sales is unlikely during a stagnant market and even less likely that a new market entry will occur.

Plaintiff has documented the attempts by two pharmaceutical and consumer products giants to acquire and expand the sales of branded condoms. In 1987–1988 American Home Products acquired and attempted to expand the sales of Today Brand condoms. Despite its continued presence in the retail markets, Today's market presence is quite minimal registering only .80% of the market using Schmid's sales estimates for the U.S. retail market. Similarly, Johnson & Johnson was unable to develop brand recognition for its Conceptrol Shields brand of

condoms and dropped it from the market in the early 1980's.

Defendants submit that entry is generally possible, but concede that it has been difficult for new entrants to establish major positions for their branded products due to the degree of consumer loyalty and brand recognition. The submitted evidence proves that entry into the condom production industry is much easier than entry into the retail market. Dippers like Fuji, Okamoto, Killian and Aladan have been able to enter and survive in the condom industry, yet their presence in the retail market is insignificant. This evidence supports the definition of the U.S. retail market as an economically significant submarket.

### 3. The Effect of the 1984 Merger Guidelines.

The Department of Justice ("DOJ") has promulgated its 1984 Merger Guidelines, 49 Fed.Reg. 26,823 (1984), which are used by DOJ attorneys in the Antitrust Division in deciding whether particular mergers violate Section 7 of the Clayton Act as well as used by businesses to assist them in complying with the applicable antitrust laws. The Court views the Product Market Definition position of the DOJ in the Merger Guidelines as an advisory aid in determining the relevant product market. The Guidelines state that DOJ "will include in the product market a group of products such that a hypothetical firm that was the only present and future seller of those products ("monopolist") could profitably impose a 'small but significant and nontransitory' increase in price." DOJ Merger Guidelines § 2.11.[4]

The DOJ will give particular weight to the following factors:

(1) Evidence of buyers' perceptions that the products are or are not substitutes, particularly if those buyers have actually considered shifting purchases between the products in response to changes in relative price or other competitive variables;

(2) Differences in the price movements of the products or similarities in price movements over a period of years that are not explainable by common or parallel changes in factors such as costs of inputs, income, or other variables;

(3) Similarities or differences between the products in customary usage, design, physical composition, and other technical characteristics; and

(4) Evidence of a seller's perceptions that the products are or are not substitutes, particularly if business decisions have been based on those perceptions.

DOJ Merger Guidelines § 2.12.

Analyzing the instant evidence with respect to the Merger Guidelines, whose relevant factors are not substantially dissimilar from the factors enunciated in *Brown Shoe*, also leads the Court to believe that sales of latex condoms in the U.S. retail market constitutes the relevant product market. The evidence shows that retailers would not view the condoms produced and sold to USAID as substitutes, nor does it seem likely that they would switch to the condoms produced by USAID in response to a small but significant and nontransitory increase in price. As we have explained above, the prices of condoms sold at retail and those sold to GSA move differently. We have also amply discussed the similarities and differences with respect to the products' usage, design and characteristics as well as the sellers' perceptions that the products are or are not substitutes.

What this Court finds most persuasive about the Merger Guidelines is their position on Production Substitution. Defendants argue that Ansell has in fact diverted supplies of condom sheaths to NSL so that Ansell would have sufficient product to fulfill its contract with USAID. Thus, de-

---

**4.** The Guidelines explain:

assuming that buyers could respond to an increase in price for a tentatively identified product group only by shifting to other products, what would happen? If readily available alternatives were, in the aggregate, sufficiently attractive to enough buyers, an attempt to raise price would not prove profitable and the tentatively identified product group would prove too narrow.

DOJ Merger Guidelines § 2.11

fendants argue that Ansell's ability to divert part of its production capacity to USAID is evidence that condoms sold in the various channels of the wholesale market are virtually perfect substitutes for each other. Plaintiff argues, on the other hand, that it has not, would not and could not divert sales from USAID to the U.S. retail market.

Ansell first explains that even if it were possible for it to increase significantly the retail demand for its condoms in the United States, they would not supply this increase demand by diverting USAID production. During fiscal 1990, Ansell earned a USAID marketing profit equal to 19% of its sales, and a 3% marketing profit on its U.S. retail sales. The parties stipulated that marketing profit is defined as sales minus cost of sales and expenses. If general overhead is accounted for as well, including research and development, factory variances, and marketing administration and central administration costs, Ansell's profits (or losses) were 12% profit in fiscal 1990 on sales to USAID and a loss of 4% on U.S. retail sales. Thus, Ansell argues that it would not be profitable for it to switch current production from its USAID sales to U.S. retail sales.

The Guidelines state, "[i]n many cases, a firm that could readily convert its facilities from the production of one product to another would have significant difficulty distributing or marketing the new product or for some other reason would find the substitution unprofitable." DOJ Merger Guidelines § 2.21. The instant case is the prototype situation wherein Ansell would find it both unprofitable to substitute its production of USAID condoms and difficult to market and distribute those condoms in the retail market.

As Judge Debevoise noted in *United States v. Calmar*, 612 F.Supp. 1298, 1304 (D.N.J.1985), a market cannot be defined with absolute certainty. After analyzing the parties claims, the various practical indicia developed by *Brown Shoe* and its

progeny, and the position taken by the Department of Justice in its Merger Guidelines, however, this Court is convinced that the sale of latex condoms through U.S. retail outlets is sufficiently well defined to be considered a "line of commerce" for antitrust purposes.

### B. *Defining the Relevant Geographic Market.*

In addition to determining the appropriate line of commerce in which to analyze the effects of the acquisition, the Court must also define the relevant geographic market. In this case, the entire United States is the proper geographic market. Where products, are distributed throughout the United States and purchasers of such products, as well as competitors, are located throughout the country, the appropriate "section of the country," as contemplated by 15 U.S.C. § 18, includes the entire United States and not merely a single region. *A.G. Spalding & Bros., Inc. v. Federal Trade Comm'n*, 301 F.2d 585, 607 (3d Cir.1962). Although the parties agree that the United States is the relevant geographic market, the defendants claim that there are substantial international and regional components to the market. The Court, however, cannot find any significant international or regional components to the market that consists of sales of latex condoms to U.S. retailers.

### C. *Analyzing the Probable Anticompetitive Effects of the Acquisition*

Defining the relevant product and geographic market would normally provide the setting within which to assess the effect of Schmid's acquisition on competition in that market. It becomes unnecessary, however, for this Court to reach the question of whether the transaction at issue is violative of Section 7 in light of our holding, *infra*, that plaintiff has neither demonstrated "antitrust injury" nor established standing to seek its requested relief. To provide the appropriate setting for the discussion of antitrust injury a further examination of the competitive structure of the particular market would be helpful.

The parties have each submitted market share estimates for U.S. sales of latex condoms to retail distributors. In addition to Ansell's (Table 2) and Schmid's (Table 3) own estimates, plaintiff has submitted market share data provided by Nielsen Marketing Research. These figures are based on periodic national surveys and it is undisputed that Nielsen's statistics serve as a source of data for the U.S. retail condom business.

Table 1 shows Nielsen market shares, in units and revenues, of latex condoms in the U.S. retail market for the twelve months ending July 1, 1990.

Table 1

Nielsen Estimates
Latex Condoms: Retail Market
U.S. Sales
12 months through July 1, 1990

|  | Shares Based on Units | Shares Based on Revenues |
| --- | --- | --- |
| Carter Wallace | 61.1% | 59.3% |
| Schmid | 22.1% | 26.2% |
| Ansell | 9.9% | 10.3% |
| NSL | 4.5% | 3.2% |
| All others | 2.4% | 1.0% |

Ansell's estimated sales of latex condoms in the U.S. retail market for 1990 are contained in Table 2. Ansell's estimates are represented in both units and revenues.

Table 2

Ansell Estimates
Latex Condoms: Retail Market
U.S. Sales
1990

|  | Shares Based on Units | Shares Based on Revenues |
| --- | --- | --- |
| Carter Wallace | 56.4% | 56.6% |
| Schmid | 24.5% | 24.6% |
| Ansell | 10.7% | 11.6% |
| NSL | 5.4% | 4.1% |
| All others | 3.0% | 3.1% |

Table 3 contains Schmid's estimated unit sales of latex condoms in the U.S. retail market for 1990. Schmid has not supplied its estimates expressed in terms of revenues.

Table 3

Schmid Estimates
Latex Condoms:  Retail Market
U.S. Sales
1990
Shares Based
on Units

| | |
|---|---|
| Carter Wallace | 62.29% |
| Schmid | 19.64% |
| Ansell | 10.18% |
| NSL | 4.73% |
| American Home | .80% |
| All others | 2.36% |

It is apparent, under any of the market share estimates, that the retail condom market is a highly concentrated market. Prior to Schmid's acquisition, the U.S. retail market consisted of four firms controlling approximately 97% of the market measured in units and between 97% and 99% of the market measured in sales revenues. Now that Schmid has acquired NSL the relevant market is dominated by only three companies.  Schmid's market share has increased to 26.6% (units) and 29.4% (revenues) under the Nielsen estimates, 29.9% (units) and 28.7% (revenues) under the Ansell estimates, and 24.37% (units) under Schmid's estimates.  Defendants contest the above figures only because they disagree with plaintiff's, and now the Court's, characterization of the relevant market and argue, unpersuasively, that the market should include sales to USAID.

Further adding to the highly concentrated nature of this market is the apparent unlikely possibility of significant new market entrants.  This issue was more fully discussed above, see III.A.2.h., *supra*.[5]

---

5. Because we have no occasion to decide the potential illegality of this acquisition under Section 7, there is no need to address defendants' claims that NSL was a "Failing Firm" or plaintiff's claims that defendants' had failed to satisfy the requirements of that defense.

6. Section 16 states in part:
   Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, *against threatened loss or damage by a violation of the*

## IV.  SEEKING DIVESTITURE UNDER CLAYTON ACT SECTION 16

### A.  *Antitrust Injury/Standing.*

Plaintiff requests this Court to either order divestiture by Schmid of its acquisition or order rescission of the transaction agreement.  Although Section 16 of the Clayton Act grants the plaintiff standing to sue for injunctive relief,[6] the remedies that section provides are only available to a certain limited group of plaintiffs.  *The Treasurer, Inc. v. Philadelphia Nat'l Bank,* 682 F.Supp. 269, 273 (D.N.J.), *aff'd w/o opinion,* 853 F.2d 921 (3d Cir.1988). The plaintiff must allege and prove threatened loss or damage that constitutes " 'antitrust injury' in order to fall within the narrow class of persons who can benefit from these laws."  *Id.*[7]

In *Brunswick Corp. v. Pueblo Bowl–A–Mat, Inc.,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977), the Supreme Court held that plaintiffs seeking damages under Section 4 of the Clayton Act must "prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which

---

*antitrust laws,* including sections 13, 14, 18, and 19 of this title, when and under the same conditions and principles as injunctive relief against *threatened conduct that will cause loss or damage* is granted by courts of equity. . . .
15 U.S.C. § 26.  (Emphasis supplied).

7. As Judge Politan recognized, the analysis for a private plaintiff differs from that which the Court would undertake when the United States is the plaintiff and a general public right of action is asserted.  *Id.* (citing *Brown Shoe Co.,* 370 U.S. 294, 82 S.Ct. 1502).

makes the defendant's acts unlawful." *Id.* at 489, 97 S.Ct. at 697 (emphasis in original). The plaintiffs in *Brunswick* were three of the ten bowling centers owned by a relatively small bowling chain. The defendant, one of the two largest bowling chains in the country, acquired several bowling centers located in the plaintiffs' market that would have gone out of business but for the acquisition. Plaintiff claimed that the purchase would deprive it of income that would have accrued had the acquired centers gone bankrupt. The Court held that this injury, though causally related to a merger alleged to violate Section 7, did not constitute antitrust injury, "since '[i]t is inimical to [the antitrust] laws to award damages' for losses stemming from continued competition." *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 109–10, 107 S.Ct. 484, 488–89, 93 L.Ed.2d 427 (1986) (quoting *Brunswick Corp.*, 429 U.S. at 488, 97 S.Ct. at 697). The *Brunswick* Court noted that this was consistent with the principle that "the antitrust laws ... were enacted for 'the protection of *competition,* not *competitors.*'" *Brunswick Corp.*, 429 U.S. at 488, 97 S.Ct. at 697 (quoting *Brown Shoe Co.*, 370 U.S. at 320, 82 S.Ct. at 1521) (emphasis in original). No claim for relief can be sustained "where the sole injury alleged is that competitors were continued in business, thereby denying [plaintiff] an anticipated increase in market shares." *Id.* 429 U.S. at 484, 97 S.Ct. at 695.

In *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983), the Court noted that among the factors that must be weighed in determining antitrust standing are the directness or indirectness of the injury, the court's ability to keep trial of the claim within manageable limits, and the nature of the injury (i.e., is it of the type that the antitrust laws were meant to prevent). *Id.* at 538–45, 103 S.Ct. at 908–912. *See also Alberta Gas Chemicals, Ltd. v. E.I. Du Pont De Nemours and Co.*, 826 F.2d 1235, 1240 (3d Cir.1987), *cert. denied*, 486 U.S. 1059, 108 S.Ct. 2830, 100 L.Ed.2d 930 (1988). Additionally, the Supreme Court noted that even if a restraint of trade is unlawful, "it does not, of course,

necessarily follow that still another party ... is a person injured by reason of a violation of the antitrust laws within the meaning of § 4 of the Clayton Act." *Associated General*, 459 U.S. at 529, 103 S.Ct. at 904.

In *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986), the Supreme Court emphasized the necessity for scrutinizing the *Brunswick* antitrust injury factor and extended this requirement to cases such as this one, where plaintiffs are seeking an injunction under Section 16. The Court held that in such a case, a private plaintiff is required to show threatened antitrust injury just as a plaintiff seeking damages under Section 4 of the Clayton Act is required to show actual antitrust injury. *Id.* at 113, 107 S.Ct. at 491. The Court reaffirmed that an injury, although causally related to an antitrust violation, nevertheless does not qualify as "antitrust injury" unless it can be attributed to an anticompetitive aspect of the practice under scrutiny. The Court added that "a showing of loss or damage due merely to increased competition does not constitute such injury." *Id.* at 122, 107 S.Ct. at 495.

The Third Circuit has also recently addressed the issues of antitrust standing. In *Alberta Gas Chemicals, Ltd. v. E.I. Du Pont De Nemours and Co.*, 826 F.2d 1235 (3d Cir.1987), *cert. denied*, 486 U.S. 1059, 108 S.Ct. 2830, 100 L.Ed.2d 930 (1988), the court recognized that the doctrine of standing was a "malleable concept" which had been construed in a variety of ways and settings and that "[t]he struggle to articulate a precise formulation is a continuing one because success has proved elusive." *Id.* at 1239. In *Alberta Gas*, the plaintiff (Alberta Gas, a methanol producer) challenged a competitor's (Du Pont's) acquisition of another company (Conoco) whose merger led to the cancellation of the acquired company's plans to produce methanol. Alberta Gas had claimed that it would lose sales caused by the termination of Conoco's plans to produce and build demand for methanol as a fuel. Applying the standards set forth in *Cargill* and *Bruns-*

*wick*, the Third Circuit held that these types of losses "were neither connected with, nor resulted from Du Pont's market power in the methanol-producing industry." *Id.* at 1241. The court noted that the same harm would have occurred had any acquirer decided to terminate Conoco's plans to produce and market methanol.

In this case, the issue now before the Court is whether Ansell has standing to seek its requested relief. This will depend upon whether it has proved threatened losses which may properly be called antitrust injury since "in the sense that plaintiffs who sustain no antitrust injury may not recover, they may be loosely said to lack standing." *Alberta Gas*, 826 F.2d at 1240. We first look to what Ansell claims to be its "antitrust injury."

### B. *Ansell's Claims of Antitrust Injury.*

Ansell asserts that the threat of injury is due primarily to Schmid's enhanced market share. It claims that the addition of the nationally recognized Protex brand to Schmid's market share gives Schmid the increased "market clout" to displace the Lifestyles brand in retail outlets through-out the United States. Plaintiff speculates that this will occur particularly in retail outlets where Protex has not been carried previously, such as convenience stores and mass merchandisers. As evidence of Schmid's intent to "drive Lifestyles from the shelves", Ansell refers to parts of LIUS's (Schmid's parent) 1988/89–1991/92 Business Plan. Under the heading "Key Strategies" this document states, along with other proposed strategies for Schmid's condom business:

> Attack smaller competitors (Ansell, NSL, Today, Fuji) using the full marketing mix to relegate these products to an insignificant section of the display and eventually drive them from the category.

PX–6 at S0001495.

In another section purporting to suggest Schmid's response to Ansell's competitive strategy, the Business Plan states:

> ▲ Target at weak Lifestyles SKU's and get them delisted in drug stores.

> ▲ Use Schmid's higher profit/square foot story and higher share per SKU to get new distribution in non-drug stores and get Lifestyles delisted.

PX–6 at S0001467.

Ansell's only witness to testify on the issue of injury [8] was Edward W. Fernas,

---

**8.** It is important to note that plaintiff's economic expert, Dr. David Smith, did not address the issue of antitrust injury. The following testimony was received at trial:

Q: Let me show you your declaration Dr. Smith. Now its true, is it not, sir, that in your declaration, you don't deal with the competitive effects of the transaction? Isn't that right?

A: No, that's not true.

Q: But you do not deal with the matter of injury to Ansell, isn't that right?

A: I deal with the anticompetitive effects in terms of the increase in concentration and entry difficulties, but I have not dealt with the issue of injury to Ansell.

. . . . .

Q: You haven't addressed injury at all in any of your submissions to the Court, isn't that correct?

A: I was not asked to address the issue of injury. In the course of doing my analysis, I have seen various documents on the subject, but I have not written anything for the corresponding subject.

Q: You weren't asked by Ansell to discuss injury, right?

A: That's right.

Q: And in fact, you didn't discuss injury with Ansell, isn't that right?

A: That's right.

Q: Now that's pretty revealing, isn't it? I mean, when you were at the Department of Justice, that's what you did, isn't it? You analyzed harms, injuries, competitive effects of all kinds of business practices, didn't you?

A: When I was at the Department of Justice, I did a lot more than that, and there have been a lot of things that I've done in the past that I was not asked to do here.

Q: Well, my question wasn't what you did more than that. My question was whether you dealt with that particular matter, the matter of injury, of competitive effect or mergers, for example?

A: At the Department of Justice, I dealt with the issue of anticompetitive effects for emergents [sic], just as I have here.

Q: That's what you do now in your business, isn't that right?

A: Often it is, yes.

Q: And you consider injuries that arise from mergers, for example?

Ansell's Vice President for its Consumer Products Division. When asked why he thought Schmid's acquisition of the Protex brand would injure Ansell Mr. Fernas stated:

> They're [Schmid] taking a brand that has brand recognition. It's an established brand. It's not a brand that was introduced a year ago. It's been on the market for many years, the better part of a decade at least.
>
> It has national distribution, predominantly in chain drug. It does have chain food distribution more than I had thought it did.
>
> They would be able to take that, that brand, an established brand and go to the retailer and present a case for increased distribution in the channels where they are and distribution where they are not in those market areas where Protex now competes.

Mr. Fernas continued:

> In my view, I believe with their [Schmid's] marketing power, clout, they'll be able to take that brand [Protex] and increase its distribution into not only areas where they have strength, but also in areas where we have strength, that they can use that.
>
> You're going to go in and increase your market share by four and a half to five percentage points, which is not a distant fourth to us. You've got a powerful brand, which we've seen that the other brands have not been able to make and either have been withdrawn or they're a downward slide.
>
> With Schmid's marketing clout, I thoroughly believe that they'll be able to displace a competitor. They're not going to displace Carter [Wallace] or themselves. And the next vulnerable candidate is Ansell. The all other category equates to less than two percent of the market.

Trial Transcript, Nov. 15, 1990, at 157–58.

A: I address the issue of anticompetitive effects, not necessarily the injury to any particular firm.

Q: You have never, in the work that you're doing now, considered the injuries that may arise out of a transaction, is that right? Is that what you're saying?

Ansell further claims that Protex's national brand recognition and "significant sales in every geographic area in the United States, except the New York metropolitan area," will enable Schmid to "induce" retailers to carry Protex in those retail outlets, particularly convenience stores and mass merchandisers, who have not carried the Protex brand before. An essential aspect of Ansell's claims of injury is the fact that Ansell believes its market share has been declining over the past two years. As a result, Ansell claims that it is particularly vulnerable "to Schmid's enhanced market clout and to Schmid's marketing of Protex as a recognized brand that will have better 'turnover' than the rapidly declining Lifestyles." Supplemental Witness Statement of Edward W. Fernas at ¶ 10. This they claim is possible because Protex, given its national brand recognition, will "turnover" at a volume sufficient to ensure its continued purchase by retailers. Plaintiff further argues that any less favorable treatment it may receive in any retail outlet due to Schmid's marketing of the Protex brand does in fact constitute "antitrust injury" because it flows from that which makes defendants' acts unlawful i.e., Schmid's increase in market share through its acquisition of Protex, a nationally recognized brand. Thus, plaintiff is claiming that its injury, the potential displacement of Lifestyles by Protex, flows from Schmid's increase in market share.

The record contains further predictions of Lifestyles's impending doom, however, as is more fully explained below, plaintiff's allegations fail to convince the Court both as to their factual proof and as to the legal merit of its claims. This Court is of the opinion, therefore, that plaintiff has failed to prove that the threatened losses, if any, that it will suffer as a result of the transaction in question, constitutes antitrust injury.

A: Well, when you say injuries, I'm saying, I am saying that I deal with the issue of anticompetitive effect. And as for your legal concept of injury, that isn't something that I ordinarily deal with.

Trial Transcript, Dec. 3, 1990, at 12–14.

## C. *Analyzing Ansell's Proof of Threatened Antitrust Injury*

As noted above, the only evidence that plaintiff has submitted on the issue of threatened loss or damage was the testimony of Mr. Fernas, Ansell's Vice President of its Consumer Products Division. Despite Ansell's exhaustive submissions on the issue of whether Schmid intends to pressure retailers to "relegate [the condoms of smaller competitors including Ansell] to an insignificant section of the display and eventually drive them from the category," as well as the alleged success of such campaigns, defendants correctly note that Ansell has presented no testimony establishing that Schmid's competitive response to the challenges posed by competitors has any actual effect on the retailers' marketing and display decisions. In fact, defendants have presented substantial evidence to the contrary that convinces the Court that plaintiff's submissions reflect misunderstandings, particularly with respect to whether the retail trade has the power to control and determine which products they will carry and how such products will be displayed. As is more fully explained below, plaintiff has not proven that Schmid's "market power" would induce retailers to drop Lifestyles from the shelves. In any event, we view any power to induce retailers to carry one brand over another in the retail condom market to be derived not from a company's competitive position in the market, but rather from the power associated with a particular product's proven turnover rate or degree of consumer acceptance. If in fact a retailer drops Lifestyles from its shelves in favor of Protex, it is difficult to see, from the evidence presented, why it would do so for any reason other than that it would be economically feasible for the retailer to do so.

### 1. The Power to Drive Lifestyles from the Shelves

Defendants have presented unrebutted testimony that condom producers simply do not have the ability to compel merchants to display their products in any particular way.[9] One of defendants' witnesses, David O. Williams, a principal of New England Consulting Group, Inc., who has extensive experience in consumer products marketing as well as first-hand knowledge of the condom industry, contests Mr. Fernas's assertion that Schmid will somehow "be able to pressure numerous retailers into replacing Lifestyles with the Protex Brand." He explained that retailers have acquired great power over the decision of whether and where to stock and display consumer goods. Especially in the large chains, he noted that these stores have enormous buying power, strict control over inventory management, and a sharp focus on product "turnover" on their shelves. He continued:

> In my opinion, the condom manufacturers—including Carter–Wallace, the largest supplier of condoms through the drug store channel of distribution, and Ansell, the major low-priced seller of condoms—are not in a position to "pressure the merchants with respect to display space or any other marketing matter. In my opinion, Schmid is not able to do so, with or without Protex. If there is any pressure at all, it comes from the retailers back to the manufacturers in the form of demands for promotional allowances, advertising support and reduced prices.

Direct Testimony of David O. Wiliams, November 7, 1990, at ¶ 8.

Another of defendants' witnesses similarly disagreed with Mr. Fernas's contentions. Melvin Fogel, a retired consumer products broker with over 45 years in the business of wholesale sales to the food and drug trade, analyzed the factors involved in how a retailer decides whether to carry

**9.** It has been stipulated by the parties that Ansell has not in the past been denied retail space because its promotional allowances were not attractive or because it could not come up with sufficient rebates to retailers. Additionally, it has been stipulated that there is no necessary correlation between the giving of rebates and the quantity of extra shelf space to the rebater's products. Rebates are not attractive to retailers unless the products for which the rebates are given are purchased by consumers in sufficient quantities to enable the retailers to make additional purchases and receive additional rebates. Accordingly, the issue of promotional practices as a form of antitrust injury suffered by Ansell will not be addressed.

condom products and how those products are displayed. Mr. Fogel explained that "[t]here is no incentive for the retailers to give Schmid any more space than Schmid's prior brands and Protex had separately." He continued:

> In my experience, a retailer's decision on whether and how to carry condom products, like many other similar health and beauty and consumer products, depends on at least three factors—(1) proven or reasonably anticipate turnover (2) space available in the store, and (3) what the manufacturer will do to make carrying the product attractive, including commitments for advertising monies. The mere fact that a well-known or well-regarded company has acquired and proposes to offer new brand does not assure that retailers will accept it. If the new brand already had a certain amount of turnover (reflecting the degree of consumer acceptance) when it was handled by another seller, the company that acquires it can expect retailers to give that brand the same display treatment, everything else being equal.

Direct Testimony of Melvin Fogel, November 7, 1990, at ¶ 6.

Nor does Schmid's acquisition of NSL give it a high enough share of the market to permit the exercise of single-firm market power. *See ABA Antitrust Section: Monograph No. 16, Private Litigation Under Section 7 of the Clayton Act: Law and Policy* 31 (1989) (noting that it is unclear how far the courts will go in permitting private plaintiffs to maintain Section 7 actions premised on the alleged threat of non-price "exclusionary" strategies and that a plaintiff advancing such a theory may be required to show that a defendant has a high enough share of the market to permit the exercise of single firm market power). The market share distribution in the relevant product market shows that the industry leader, Carter Wallace controls approximately 60% of the market, whereas the combined market share after the Schmid/NSL transaction will be under 30% of the market. Despite plaintiff's allegation, there was no evidentiary support for its claim that Carter Wallace was able to increase its overall shelf space by inducing retailers after it had acquired the Mentor

condom brand. It follows then that plaintiff has failed to offer evidence proving that "Schmid will achieve a far greater increase in its marketing clout due to the much greater recognition of the Protex brand compared to Mentor." Ansell has failed to explain how Schmid, with a far smaller market position than Carter Wallace, will succeed in pressuring retailers to carry its brands at the expense of Lifestyles.

2. Proof of Collusive Practices and Other Forms of Anticompetitive Behavior

Ansell also argues that it will suffer threatened loss or damage as a result of the increased possibility of collusive practices between Schmid and Carter Wallace, the two industry leaders. Ansell has submitted proposed findings that Schmid has engaged in "collusive arrangements" with Carter Wallace with respect to the manufacture (supply of natural lambskin) and marketing (price and advertising agreements) of lambskin condoms. Specifically Ansell claims that increased concentration of the market caused by the Schmid/NSL transaction will make the possibility of collusion more likely in the latex condom market. The relevance of this claim is marginal at best, for it involves practices in a completely different product market. Moreover, Ansell neither presented testimony to support these allegations at the trial, nor did Ansell's counsel include any reference to those allegations in his summation. Specifically lacking were any arguments on how Ansell could possibly be hurt by any "collusion" that would generally raise prices of latex condoms in a market Ansell itself serves. The Court therefore has found no credible evidence to suggest that defendant Schmid had engaged, or is likely to engage in the speculative predatory practices alleged by Ansell.

After considering all of the evidence submitted by both plaintiff and defendants, and after assigning appropriate weight to the testimony and documentation supplied, the Court must conclude that plaintiff Ansell has failed to prove by a preponderance of the evidence that the effect of defendant Schmid's acquisition may be to cause anti-

trust injury to plaintiff which would cause the Court to grant injunctive relief against threatened loss or damage. Speculative claims of predatory behavior cannot provide the basis for standing in Section 16 injunction cases. A contrary holding would effectively allow plaintiff to circumvent *Brunswick*'s antitrust injury requirement.

In addition to plaintiff's failure to prove threatened loss or damage, as is more fully explained below, the Court believes that plaintiff has also completely failed to prove that the alleged harm it might suffer from the Schmid/NSL transaction actually constitutes antitrust injury; that is, injury of the sort the antitrust laws were designed to remedy. *Cargill,* 479 U.S. at 113, 107 S.Ct. at 491.

The Supreme Court has stated that the purpose of the antitrust injury requirement is to ensure that the harm claimed by the plaintiff corresponds to the rationale for finding a violation of the antitrust laws in the first place. This prevents losses arising from competition from supporting suits by private plaintiffs for either damages or equitable relief. *Atlantic Richfield Co. v. USA Petroleum Co.,* — U.S. —, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990). The Court observed:

> Conduct in violation of the antitrust laws may have three effects, often interwoven: in some respects the conduct may reduce competition, in other respects it may increase competition, and in still other respects effects may be neutral as to competition. The antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from an competition-*reducing* aspect or effect of the defendant's behavior.

*Id.* 110 S.Ct. at 1894. This is a reaffirmation of *Brunswick* wherein the Court previously noted that the alleged injury "should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be 'the type of loss that the claimed violations ... would be likely to cause.'" *Brunswick,* 429 U.S. at 489, 97 S.Ct. at 697 (quoting *Zenith Radio Corp. v. Hazeltine Research,* 395 U.S. 100, 125, 89 S.Ct. 1562, 1577, 23 L.Ed.2d 129 (1969)).

In this case, plaintiff asserts that injury to Ansell is in fact the type of injury the antitrust laws were designed to prevent. Ansell asserts that Schmid has the intent to drive Ansell from the U.S. retail market for latex condoms and intends and has the means to use the increased market share it obtained by acquiring the Protex brand. Yet, contrary to what Ansell claims, the acquisition of the Protex brand and the concomitant increase in Schmid's market share is relevant only for the purposes of determining whether the transaction violates Section 7, an issue we need not decide. As a private plaintiff, Ansell would need to show an injury as well as a violation of Section 7. *See Atlantic Richfield Co.,* 110 S.Ct. at 1894 ("Thus, 'proof of a per se violation and of antitrust injury are distinct matters that must be shown independently.'") (citing P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 334.2c, p. 330 (1989 supp.)).

Ansell has submitted no evidence to show that the increase in market share *alone* would result in the claimed injury to Ansell. Rather, Ansell is claiming that Schmid's acquisition of the *Protex brand* is detrimental to competition. Ansell thus claims that Schmid, "using the additional marketing clout of the Protex brand, will be able to complete its program of driving all small competitors out of the U.S. retail latex market." *See* Plaintiff's Objections to Defendants' Final Proposed Findings of Fact at ¶ 134. All of plaintiff's predictions, therefore, seem to depend on the national recognition of the Protex brand, not just the fact that Schmid has increased its market share beyond what may be a permissible level. Under any of the applicable legal standards, the Court cannot conclude that the alleged injury projected is the type the claimed violations would likely cause. If we had held that the acquisition of NSL by Schmid warranted a finding that it violated Section 7 because it may be to substantially lessen competition in the defined line of commerce, the Court's holding would have necessarily been based on whatever anticompetitive impact the acquisition would have in the existing highly-concentrated market. The injury that Ansell now claims, however, would not "flow" from

that sort of violation. Nor is Ansell's showing of injury anything more than a demonstration of threatened loss from continued competition. It is almost as if Ansell is claiming that the marketing clout Schmid may gain through increased market share would not have meant anything if they had increased that market share through the acquisition of a less popular brand. In fact, plaintiff's allegations are totally consistent with this statement. Ansell claimed:

> In 1987–88, American Home Products, a $5.5 billion company with extensive experience in pharmaceutical and consumer products, acquired and attempted to expand the sales of Today brand condoms ... American Home was not able to develop brand recognition and loyalty for its product, even during the rapid expansion of 1895–1988. Thus, even though American Home, *through its marketing clout*, was able to get the Today condom on retail shelves and pegboards around the country, *consumers failed to purchase it.*

Plaintiff's Final Proposed Findings of Fact at ¶ 75. Ansell also claimed that Schmid was recently able to induce retailers to initially carry two new brands, Koromex and She's Sheik, however, the evidence shows that neither brand developed sufficient market place recognition or consumer following to lead to sufficient sales turnover.

Ansell is thus fearful because Schmid has acquired a popular brand. This is not antitrust injury, and this type of injury to a private plaintiff is not what is contemplated by any violation of Clayton 7. Ansell is essentially concerned with the success Schmid may achieve by continuing to market a condom brand that has established consumer acceptance. If retailers decide to "displace Lifestyles from the shelves" the evidence reveals that this would be primarily due to how they view Protex's likely "turnover", not because Schmid was able to pressure them into marketing that particular brand. Ansell's alleged losses, therefore, are not connected with whatever increase in "market power" Schmid may achieve in the retail condom market. This is clear because the probability that the same claimed losses, displacement from the shelves, etc., would occur is just as great had any other viable company purchased the Protex brand and continued its marketing. *See Alberta Gas*, 826 F.2d at 1241. Any success Schmid may achieve in introducing Protex into new channels of distribution will primarily result from competition rather than from any possible advantage Schmid may gain from its increased share of the market. As Mr. Fernas himself stated, "This simply reflects the retailers' desire to stock items that sell and to avoid items that do not." Supplemental Witness Statement of Edward W. Fernas at ¶ 4. Plaintiff turns antitrust law on its head by suggesting that Ansell has a right to be protected from the introduction of a competing brand into channels of distribution where Ansell is well-established.

## V. CONCLUSION

The Australia-based chairman of Ansell's parent company wrote:

> [T]he acquisition by LIG (Schmid) must raise serious anti Trust problems with Justice Department, although the stated purchase price may be below the legal reporting obligation threshold.... Please take up with our legal advisors as to how we should pursue anti Trust objections to the deal—if successful, we might even end up with the business coming to us by default!

Memo from H. Boon to G. Woodward, August 31, 1990, DX–1. Ansell has repeatedly stated that it would have been interested in discussing the purchase of NSL and this memo merely evidences a disappointment that Ansell did not receive the Protex brand itself. However, as Judge Politan stated in *The Treasurer*, "[t]his Court is not, nor can it be, under any circumstances, a tool to promote the interest of one competitor over another under the guise of declaring illegal a proposed merger."

Accordingly, Plaintiff has failed to make the required showing of threatened antitrust injury under Section 16 of the Clayton Act and therefore, its request for divestiture or rescission must be DENIED.